457 So.2d 495 (1984)
DADE COUNTY CONSUMER ADVOCATE'S OFFICE, Appellant,
v.
DEPARTMENT OF INSURANCE and Bill Gunter, in His Official Capacity As Insurance Commissioner, Appellees.
No. AV-400.
District Court of Appeal of Florida, First District.
August 17, 1984.
Rehearing Denied October 24, 1984.
*496 William B. Schultz and Alan B. Morrison, Public Citizen Litigation Group, Washington, D.C., and Mary Charlotte McCall, Tallahassee, for appellant.
Curtis A. Billingsley, Dept. of Insurance, Tallahassee, for appellees.
James N. McConnaughhay and Arthur C. Beal, Jr. of McConnaughhay, Roland & Maida, Tallahassee, for amicus curiae Florida Ass'n of Ins. Agents.
J. Robert McClure, Jr. of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tallahassee, for amicus curiae Florida Ass'n of Life Underwriters.
W.O. Birchfield and Dennis E. Hayes of Martin, Ade, Birchfield & Johnson, Jacksonville, for amicus curiae American Council of Life Ins., Inc.
ERVIN, Chief Judge.
Appellants, Dade County Consumer Advocate's Office and Walter Dartland, challenge the constitutionality of Sections 626.611(11) and 626.9541(1)(h)1, Florida Statutes (1983),[1] which prohibit insurance agents from negotiating with clients as to the amount of their commission, or offering *497 to rebate a portion thereof to the clients, alleging that they violate the due process clause, Article 1, Section 9, of the Florida Constitution. The trial court upheld the statutes as legitimate exercises of the state police power. We disagree and reverse.
The applicable standard of review is whether the challenged anti-rebate statutes reasonably and substantially promote the public health, safety or welfare as required by the due process clause of the Florida Constitution. Liquor Store, Inc. v. Continental Distilling Corp., 40 So.2d 371 (Fla. 1949); 10 Fla.Jur.2d Constitutional Law §§ 211, 214 (1979 & Supp. 1983). To sustain the validity of this exercise of police power there must be shown some rational relation to a legitimate state interest seeking to protect the public. We are unable to find any legitimate state interest justifying the continued existence of the anti-rebate statutes.
The Department of Insurance (department) and amici curiae[2] argue that the statutory ban against insurance commission rebates is rationally related to the state interest by guaranteeing insurer solvency and the prevention of discrimination among insureds in the same actuarial class. They argue further that regulation of rebate practices, a control which is not imposed upon any other profession or occupation, is necessitated in the present case by the unique characteristics of the insurance industry, such as the present payment for a future benefit and agent educational qualifications at less than high school level, which mandate special protection in this field.
We find these arguments unpersuasive. We are unable to perceive any relation between an agent's freedom to rebate a portion of the agent's commission earned on sale of a policy[3] and the future solvency of the policy carrier. Neither is it possible to discern discrimination in that the net premium paid to the insurer as the cost of the policy remains constant throughout an actuarial class regardless of variable commission rebates offered by agents to individual classmembers. The ability of the consumer within a given actuarial class to negotiate for a rebate, and thereby reduce the overall amount paid for insurance relative to another consumer in that class, does not constitute undesirable discrimination in a free market economy. Such price differences have historically been considered fair in every other segment of our economy.
Perhaps the department's and amicis' strongest argument is that the agent who is permitted to rebate will do so at the expense of his customers, in that they will not be provided with the quality of information regarding the best type of insurance suited to their needs because the agent, having negotiated his commission, will not spend the requisite time counseling his clients. Accordingly, the argument goes, the public must be protected from low-cost, low-quality service, and the statutes banning rebating therefore advance a legitimate public interest. We recognize that this argument is not without merit but we are not convinced that it validates the exercise of the police powers of the state.[4] Indeed, the Supreme Court was faced with a similar argument in Virginia Pharmacy Board v. Virginia Consumer Council, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 *498 (1976), in support of a Virginia statute prohibiting druggists from advertising the prices of their drugs, which had urged the public needed to be protected from the evils of advertising because the low-cost, low-quality pharmacist would attract too many unwitting customers and thereby drive the professional druggist out of business, resulting in the destruction of the traditional pharmacist-customer relationship. The Court, however, rejected the argument, stating:
There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them. If they are truly open, nothing prevents the "professional" pharmacist from marketing his own assertedly superior product, and contrasting it with that of the low-cost, high-volume prescription drug retailer. But the choice among these alternative approaches is not ours to make or the Virginia General Assembly's. It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us. Virginia is free to require whatever professional standards it wishes of its pharmacists; it may subsidize them or protect them from competition in other ways. Cf. Parker v. Brown, 317 U.S. 341, 87 L.Ed. 315, 63 S.Ct. 307 (1943). But it may not do so by keeping the public in ignorance of the entirely lawful terms that competing pharmacists are offering. In this sense, the justifications Virginia has offered for suppressing the flow of prescription drug price information, far from persuading us that the flow is not protected by the First Amendment, have reinforced our view that it is.
425 U.S. at 770, 96 S.Ct. at 1829.
Similarly, we believe that the choice opted for by the Florida legislature does not come within the confines of the due process clause. The dangers of the misuse of information to the consumer by the unscrupulous or indifferent agent may exist, but the possibilities of such abuse cannot serve to suppress bargaining or information which might otherwise lead to an informed choice. Indeed, competitive forces at work in the marketplace should generally serve to protect consumers against unfairly discriminatory prices, provided that there is adequate disclosure available to make consumers aware of alternative sources and prices of insurance.
Likewise, we are unimpressed by cases cited by the department and amici in support of anti-rebate statutes. The precedential value and persuasiveness of these cases[5] are severely limited by the impact of the revolution in consumer's rights which has occurred since the turn of the century. The paternalistic approach to a consumer's ability to make reasonable decisions without government intervention as exemplified by these rulings has been rejected by modern courts.[6]
In the absence of any apparent rational relation between the prohibition of rebates and some legitimate state purpose in safeguarding the public welfare, we conclude *499 the anti-rebate statutes, sections 626.611(11) and 626.9541(1)(h)1, constitute an unjustified exercise of the police power of this state, and are therefore violative of the due process clause, Article 1, Section 9, Florida Constitution.
We have considered appellees' argument that the effect of an invalidation of the two statutory provisions would do more than simply permit an agent to contract with a customer over a rebate of his commission; that section 626.611(11), providing for disciplinary action for "rebating, or attempt thereat, or unlawfully dividing or offering to divide his commission with another", includes both rebating an agent's commission and dividing an agent's commission with anyone. Appellees assert that if all of subsection (11) is invalidated, the following conduct would be authorized: An insurance agency owner could lawfully skim commissions from his agent's sales; an insurer could demand a kick back from an agency for the right to sell its product; and an agent might split his commission with an employer for each policy the agent sells the employees. Appellees' argument fails to recognize that certain kinds of sharing of or dividing commissions are declared unlawful elsewhere in chapter 626, specifically: section 626.753 (general lines agents and solicitors); section 626.794 (life insurance agents); and section 626.838 (health insurance agents). Those three statutory provisions  rather than section 626.611(11)  identify what is an unlawful division of an agent's commission, and prohibit such a division. Disciplinary action for unlawful divisions is provided for in section 626.753(4) and section 626.611(13). Therefore, our decision does not affect proscribed activity otherwise provided in the Florida Statutes.
Appellees similarly argue that the practical result of declaring section 626.9541(1)(h)1 unconstitutional would be far broader in scope than merely allowing an agent to discount a portion of his commission to an individual purchaser. For example, appellees first claim that if section 626.9541(1)(h)1a is struck down, that agent's misrepresentations would thereby be authorized. Appellees may have overlooked the fact that such misrepresentations are now prohibited in sections 626.9541(1)(a), (b) and (e) and 626.611(5). Another effect of invalidating section 626.9541(1)(h)1, appellees contend, is that an agent or insurer would be able to provide any valuable consideration or inducement not specified in the contract. We reply that since such consideration or inducement would not be available to all individuals of the same actuarially supportable class and risk, this type of activity falls under the unfair discrimination provision of the same statute and thus would be considered an unfair method of competition or deceptive act or practice. See Section 626.9541(1)(g). Although section 626.9541(1)(h)1 may seem to cover a wide range of practices, its title is styled "Rebates" and simply applies to the variety of ways in which an agent may offer a rebate to a customer.
REVERSED.
BOOTH and WENTWORTH, JJ., concur.
NOTES
[1] § 626.611(11), Fla. Stat., states:

Grounds for compulsory refusal, suspension or revocation of agent's ... license ... .  The department shall deny, suspend, revoke, or refuse to renew or continue the license of any agent ..., and it shall suspend or revoke the eligibility to hold a license ... of any such person, if it finds that as to the applicant, licensee, or permittee any one of more of the following applicable grounds exist:
* * * * * *
(11) Rebating, or attempt thereat, or unlawfully dividing or offering to divide his commission with another.
§ 626.9451(1)(h)1, Fla. Stat., states:
Unfair methods of competition and unfair or deceptive acts or practices defined. 
(1) UNFAIR METHODS OF COMPETITION AND UNFAIR OR DECEPTIVE ACTS.  The following are defined as unfair methods of competition and unfair or deceptive acts or practices:
* * * * * *
(h) Rebates. 
1. Except as otherwise expressly provided by law, or in applicable filing with the department, knowingly:
a. Permitting, or offering to make, or making, any contract or agreement to such contract other than as plainly expressed in the insurance contract issued thereon;
b. Paying, allowing, or giving, or offering to pay, allow, or give, directly, or indirectly, as inducement to such insurance contract, any special favor or advantage in the dividends or other benefits thereon, or any valuable consideration of inducement whatever not specified in the contract;
c. Giving, selling, or purchasing, or offering to give, sell, or purchase, as inducement to such insurance contract or in connection therewith, any stocks, bonds or other securities of any insurance company or other corporation, association, or partnership, or any dividends or profits accrued thereon, or anything of value whatsoever not specified in the insurance contract.
[2] Amici Curiae Florida Association of Life Underwriters, Florida Association of Insurance Agents and American Council of Life Insurance, Inc. appeared on behalf of appellee.
[3] Typically the consumer pays the company a single fee, the premium, from which the company pays its agent a commission, compensating him or her for the services rendered by the sale. The company in turn applies the money remaining toward its expenses, including its commitment to satisfy its contractual obligations to pay future claims. See Report of the U.S. Department of Justice to the Task Group on Antitrust Immunities 288-89 (1977) [U.S. Department of Justice Report].
[4] There is, indeed, the contrary argument that protectionism in the form of anti-rebating statutes "has resulted in the prohibition against nonstandard insurance in some states, resistance to innovation in the risk assessment process, the imposition of a simplified classification system, and the establishment of various other mechanisms of `internal' subsidization." See U.S. Department of Justice Report at 290-91.
[5] O'Gorman & Young, Inc. v. Hartford Fire Insurance Co., 282 U.S. 251, 51 S.Ct. 130, 75 L.Ed. 324 (1931); Utah Association of Life Underwriters v. Mountain State Life Insurance Company, 58 Utah 579, 200 P. 673 (1921); Calvin Phillips & Co. v. Fishback, 84 Wash. 124, 146 P. 181 (1915); Leonard v. American Life & Annuity Co., 139 Ga. 274, 77 S.E. 41 (1913); People v. Hartford Life Insurance Company, 252 Ill. 398, 96 N.E. 1049 (1911); Rideout v. Mars, 99 Miss. 199, 54 So. 801 (1911); Metropolitan Life Insurance Company v. People, 209 Ill. 42, 70 N.E. 643 (Ill. 1904); People v. Formosa, 131 N.Y. 478, 30 N.E. 492 (Ct.App. 1892); Commonwealth v. Morningstar, 144 Pa. 103, 22 A. 867 (1891).
[6] See, e.g., Virginia Pharmacy Board v. Virginia Consumer Council; Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); Liquor Store, Inc. v. Continental Distilling Corporation, 40 So.2d 371 (Fla. 1949); The Florida Bar v. Brumbaugh, 355 So.2d 1186 (Fla. 1978); Stadnik v. Shell's City, Inc., 140 So.2d 871 (Fla. 1962).